UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| CECILY I. ENGLAND | |
| Plaintiff, | No. 3:16-cv-1951 (MPS) |
| v. | |
| AMICA MUTUAL INS. CO. | |
| Defendant. | |

**RULING ON MOTION TO DISMISS**

Plaintiff Cecily I. England filed this action in state court against her homeowner's insurance provider, Amica Mutual Insurance Company ("Amica"), seeking damages for its failure to provide coverage for damage to the basement walls of a residence she owns. (ECF No. 1-1.) Amica removed the case to this court on November 29, 2016. (ECF No. 1.) On December 6, 2016, Amica moved to dismiss the case, arguing that the alleged loss was not covered by any of the policies issued to Ms. England and that Ms. England's claim was untimely. (ECF No. 10.) For the reasons set forth below, the motion is GRANTED.

**I.   Factual Allegations**

According to the allegations in the complaint, Ms. England owns a property located at 1 Fernwood Drive, Bolton, Connecticut ("the Property"). (ECF No. 1-1 ¶ 1.) Amica has insured the Property at all relevant times. (*Id*. ¶ 3.) Ms. England has made all required insurance payments. (*Id*. ¶ 4.)

"While moving items" on an unspecified date, Ms. England "observed visible cracking patterns in the basement walls" of the Property. (*Id*. ¶ 5.) On October 30, 2014, a structural engineer inspected the basement of the Property. (*Id*. ¶ 6.) In a report dated November 3, 2014, the engineer

1

concluded that "the concrete deterioration and cracking was caused by a chemical reaction occurring in the concrete," and recommended that the basement walls be replaced (*Id*. ¶ 7.) At the time Ms. England filed the complaint, the cost of repair was expected to be approximately $60,000. (ECF No. 1-1 ¶ 7.)[1]

At an unspecified date, Ms. England made a claim for coverage under her homeowner's policy. (*Id.* ¶ 8.) At the time Ms. England filed the complaint, Amica had not made a decision on her claim. (*Id*. ¶ 12.) In her opposition brief, Ms. England represented that she still had not received a decision from Amica. (ECF No. 20 at 1-2.)[2] Ms. England alleges that the concrete in her home "continues to deteriorate," causing damage to the basement walls. (ECF No. 1-1 ¶ 14.)

---

[1] Although neither party contests that the amount in controversy in this action exceeds $75,000, the Court has its own obligation to determine whether it has diversity jurisdiction. "A party invoking the jurisdiction of the federal court [on the basis of diversity] has the burden of proving that it appears to a reasonable probability that the claim is in excess of the statutory jurisdictional amount." *Scherer v. Equitable Life Assurance Society of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003) (internal quotations omitted). The Second Circuit recognizes a "rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy." *Id*. (internal quotations omitted). Here, Ms. England alleges that the cost of replacement of her concrete basement walls is estimated to be $60,000. (ECF No. 1-1 ¶ 7.) The complaint does not explicitly claim other monetary damages. However, as Amica notes in its Notice of Removal, the complaint suggests that "Plaintiff also seeks damages for 'damage to the structure of the dwelling itself.'" (ECF No. 1 ¶ 6 (citing ECF No. 1-1 ¶ 7).) Amica also notes that "if Plaintiff is successful in demonstrating that coverage is owed under the terms of the Policy . . . she may also be entitled to damages for additional living expenses under the terms of the policy." (ECF No. 1 ¶ 6.) There is thus a reasonable probability that, in addition to damages resulting from the cost of replacement of Ms. England's basement walls, damage to the structure of the Property and any living expenses potentially covered by the Policy would result in damages exceeding $15,000, bringing the total amount in controversy in excess of $75,000.

[2] There is no issue of ripeness here, as the Court may construe Ms. England's complaint, which seeks, among other things, a demand for "[s]uch other relief . . . the Court deem[s] equitable" (ECF No. 1-1 at 6.), as one seeking a declaratory judgment as to whether the damage to the Property is covered by an Amica policy. *See* Fed. R. Civ. P. 54(c). Courts in this District have recognized that "Connecticut law has made clear that there is no question that a declaratory judgment action is a suitable vehicle to test the rights and liabilities under an insurance policy." *Allstate Ins. Co. v. Martinez*, No. 3:11-cv-574 (VLB), 2012 WL 6115094, at *5 (D. Conn. Dec.

Ms. England alleges in the complaint that under "Section I, 'Perils Insured Against,'" the homeowner's policy covers "'direct physical loss to the property'; in this case, the chemical reaction that occurred in the concrete." (*Id.* ¶ 9.) Ms. England further alleges that under the policy, "losses due to chemical reaction are not excluded from policy coverage." (*Id.* ¶ 10.) Ms. England also alleges that "under Section I, 'Property Coverage'," the policy covers "'Collapse' of the basement walls consistent with the progressive deterioration of the concrete caused by the chemical reaction." (*Id.* ¶ 11.) Ms. England did not attach to her complaint the policy she relies on.

Amica attached to its motion to dismiss five policies issued to insure the Property, one for each year dating from April 7, 2010, through April 7, 2015 (collectively, "the Policies").[3] Each of the Policies includes a section titled "Section I – Property Coverages," which contains portions titled "Coverage A – Dwelling," "Coverage B – Other Structures," "Coverage C – Personal Property," "Coverage D – Loss of Use," and "Additional Coverages." (*See* ECF Nos. 10-2 – 10-6.)

In the policies dating from April 7, 2012, through April 7, 2015 (collectively, "the 2012 – 2015 Policies"), the portion titled "Additional Coverages," as amended by an endorsement titled "Special Provisions – Connecticut," specifies:

8. Collapse

---

10, 2012) (quoting *Vermont Mut. Ins. Co. v. Ciccone*, No. 3:09-cv-445 (CSH), 2012 WL 5199688, at *3 (D. Conn. Oct. 22, 2012)).

[3] Although Ms. England's homeowner's policy is not attached to the complaint or formally incorporated by reference, as discussed below, "the court may nevertheless consider [a document] where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Chambers v. Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotations omitted). The Policies attached to Amica's motion to dismiss were effective from April 7, 2010, through April 7, 2015. (ECF Nos. 10-2 – 10-6.) Ms. England does not contest that one or more of these Policies apply.

> . . .
> b. The coverage provided under this Additional Coverage – Collapse applies only to an abrupt collapse.
>
> c. For the purpose of this Additional Coverage – Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purposes.
>
> d. This Additional Coverage – Collapse does not apply to:
>
>> (1) A building or any part of a building that is in danger of falling down or caving in;
>> (2) A part of a building that is standing, even if it has separated from another part of the building; or
>> (3) A building or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.
>
> e. We insure for direct physical loss to covered property involving abrupt collapse of a building or any part of a building if such collapse was caused by one or more of the following:
>
>> (1) The Perils Insured Against;
>> (2) Decay, of a building or any part of a building, that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;
>> . . .
>> (6) Use of defective material or methods in construction, remodeling or renovation.
>
> f. Loss to a[] . . . foundation . . . is not included under e.(2) through (6) above, unless the loss is a direct result of the collapse of a building or any part of a building.

(*See, e.g.*, ECF No. 10-6 at 42-43.)

Under "Section I – Perils Insured Against," the 2012 – 2015 Policies specify with respect to "Coverage A – Dwelling And Coverage B – Other Structures":

> 1. We insure against direct physical loss to property described in Coverages A and B.
>
> 2. We do not insure, however, for loss:
>
> a. Excluded under Section I – Exclusions;

4

    b. Involving collapse, including any of the following conditions of property or any part of the property:

        (1) An abrupt falling down or caving in;
        (2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or
        (3) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to (1) or (2) above;

    except as provided in E.8 Collapse under Section I – Property Coverages; or

    c. Caused by:
. . .
        (6) Any of the following:

        (a) Wear and tear, marring, deterioration;
        (b) Mechanical breakdown, latent defect, inherent vice or any quality in property that causes it to damage or destroy itself;
        (c) Smog, rust or other corrosion, or dry rot;
. . .
        (f) Settling, shrinking, bulging or expansion, including resultant cracking, of . . . foundations, walls, floors, roofs or ceilings . . . .

(*See, e.g.*, *id.* at 23-24.)

Under "Section I – Exclusions," the 2012 – 2015 Policies state:

B. We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not precluded by any other provision in this policy is covered.
. . .
3. Faulty, inadequate or defective:
. . .
c. Materials used in repair, construction, renovation or remodeling . . .

of part or all of any property whether on or off the residence premises.

(*See, e.g.*, *id.* at 27.)[4]

---

[4] The language in "Additional Coverages" and "Section I – Perils Insured Against" varies in minor ways from the 2010 – 2012 Policies to the 2012 – 2015 Policies. (*Compare, e.g.*, ECF No. 10-2 at 42-43, *with* ECF No. 10-6 at 42-43.) The variations do not affect the interpretation of the Policies for the purpose of Amica's motion to dismiss, and neither party relies on the variations. I will refer to the language in the 2012 – 2015 Policies in this decision.

5

**II.     Legal Standards**

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), I take the plaintiff's factual allegations in the complaint "to be true and [draw] all reasonable inferences in" her favor. *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court need not accept legal conclusions as true and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In deciding a Rule 12(b)(6) motion, I may consider documents attached to, integral to, or incorporated by reference in the complaint. *See* Fed. R. Civ. P. 10(c); *Chambers v. Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.") (internal quotations omitted).

"An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract." *Connecticut Medical Ins. Co. v. Kulikowski,* 286 Conn. 1, 5 (2008) (citation and quotation marks omitted).

> If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning…. When interpreting an insurance policy, we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result…. As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading. Under those circumstances, any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy.

*Id.* at 5-6 (citations, quotation marks, and alterations omitted).

**III. Discussion**

**A. Applicable Policies**

Amica argues that Ms. England has not sufficiently alleged that she was covered by an Amica homeowner's policy during the relevant time period. (ECF No. 10 at 22-23.) Ms. England does allege, however, that "[a]t all times relevant herein, the Defendant provided homeowner's insurance coverage to the Plaintiff" for the Property, and that "[o]n or about October 30, 2014, the Plaintiff had her basement inspected by a professional structural engineer" after "observ[ing] visible cracking patterns in the basement walls." (ECF No. 1-1 ¶¶ 3, 5-6.) Ms. England also alleges that Amica itself sent an engineer to inspect the Property in December 2014. (*Id.* ¶ 13.) Drawing reasonable inferences in Ms. England's favor, I find that Ms. England has sufficiently alleged that she was covered by an Amica homeowner's policy at the time the alleged loss occurred. As noted above (*see* note 4, *supra*), it makes no difference which Amica policy governs the alleged loss, and I will analyze the complaint under the language in the 2012 – 2015 Policies.

**B. "Collapse" Coverage**

Ms. England claims that she is entitled to coverage under the collapse provision located under "Section I, 'Property Coverage'" of the Policies. (ECF No. 1-1 ¶ 11.) The 2012 – 2015 Policies specify in this section, under "Additional Coverages," that collapse coverage "applies only to an abrupt collapse." (ECF No. 10-6 at 42.) The 2012 – 2015 Policies further state that, "[f]or the purpose of this Additional Coverage – Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." (*Id.*) Thus, under the Policies, Ms.

7

England's alleged loss must have resulted from an abrupt event in order for collapse coverage to apply.

Ms. England argues that the term "collapse" is "ambiguous in light of the qualifiers made by the provisions in the policy," relying on *Dalton v. Harleysville Worcester Mut. Ins. Co.*, 557 F.3d 88, 93 (2d Cir. 2009). (ECF No. 20 at 5.) Ms. England's reliance on *Dalton* is misplaced. In that case, the policy at issue did not define "collapse" to have any temporally abrupt quality, and the Court had to look to unsettled New York law to determine the meaning of "collapse." *See id.* at 90-91. By contrast, the Policies here clearly define "abrupt collapse" as an "abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." (*See, e.g.*, ECF No. 10-6 at 42.)[5] The Policies therefore unambiguously require an abrupt event for collapse coverage to apply.

Ms. England does not argue, and I do not find, that the term "abrupt" is ambiguous. The term must therefore be "accorded its natural and ordinary meaning." *Connecticut Med. Ins. Co. v. Kulikowski*, 286 Conn. 1, 5 (2008.) "To ascertain the commonly approved usage of a word in an insurance policy, it is appropriate to look to the dictionary definition of the term." *Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*, 311 Conn. 29, 42 n.8 (2014) (internal citation and alteration

---

[5] Further, the Policies in this case include language substantially identical to language the *Dalton* Court suggested would unambiguously resolve the issue of coverage. *Compare Dalton*, 557 F.3d at 93 ("We also note that other insurers in New York used forms that speak much more directly to the dispute involved here. *E.g.*, [*Rector St. Food Enter., Ltd. v. Fire & Cas. Ins. Co. of Conn.*, 827 N.Y.S.2d 18, 18 (App. Div. 2006)] (construing policy language that a 'building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion').") *with* ECF No. 10-6 at 42 (stating that collapse coverage does not apply to "a building or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning settling, shrinkage or expansion").

omitted). The ordinary meaning of the word "abrupt" is "characterized by or involving action or change without preparation or warning." *Merriam Webster's Collegiate Dictionary* (10th ed. 1994).

Even when the allegations are construed in the light most favorable to Ms. England, Ms. England does not allege that any collapse occurred abruptly, or that any change occurred to the Property without preparation or warning. Indeed, Ms. England does not even argue in her opposition brief that any damage to the Property occurred abruptly. Rather, Ms. England alleges that a chemical reaction caused "concrete deterioration and cracking." (ECF No. 1-1 ¶ 7.) Elsewhere in the complaint, Ms. England characterizes the damage as "progressive deterioration of the concrete caused by the chemical reaction" (*Id.* ¶ 11) and as "continual deterioration." (*Id.* ¶ 15.) These allegations that the damage has occurred progressively and continuously are at odds with any claim that the damage occurred abruptly.

Courts have ruled in favor of insurance companies in concrete decay cases where insurance policies require "abrupt" events for collapse coverage to apply. *See, e.g.*, *Alexander v. General Ins. Co. of America*, No. 3:16-cv-59 (SRU), transcript of oral ruling, ECF No. 22 at 23 (D. Conn. July 7, 2016) (granting motion to dismiss where policy at issue defined collapse as an "abrupt falling down or caving in"); *Jemiola v. Hartford Cas. Ins. Co.*, No. CV-15-6008837-S, 2017 WL 1258778, at *1 (Conn. Super. Ct. Mar. 2, 2017) (granting summary judgment where policy defined collapse as "an abrupt falling down or caving in"); *Toomey v. Central Mut. Ins. Co.*, No. CV-15-6009841-S (Conn. Super. Ct. Aug. 3, 2017) (unpublished) (granting summary judgment where policy defined collapse as "an abrupt falling down or caving in").

Further, as noted (*see* note 5, *supra*), the 2012 – 2015 Policies specify that collapse coverage does not apply to "[a] building or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion." (ECF

9

No. 10-6 at 42.) Thus, collapse coverage does not apply where a building is standing but shows evidence of cracking. In addition to alleging that the basement walls of the Property are progressively deteriorating (which falls outside the definition of "collapse" for the reasons discussed above), Ms. England alleges that the Property displayed "visible cracking patterns." (ECF No. 1-1 ¶¶ 5-6.) Ms. England does not allege that the Property is no longer standing, but rather that the concrete "continues to deteriorate, which is causing damage to the basement walls." (*Id*. ¶ 14.) The cracking Ms. England alleges to have occurred falls squarely within the Policies' language excluding collapse coverage for buildings that show evidence of cracking but are still standing. As a result, Ms. England has not alleged that she is entitled to coverage under the Policies' collapse provisions.[6]

### C. Coverage for "Chemical Reactions"

Alternatively, Ms. England apparently seeks coverage under provisions of the Policies independent of the "collapse" coverage.[7] She argues that she is entitled to coverage because the loss allegedly sustained was due to a "chemical reaction," which, she contends, is not expressly excluded by the Policies. (ECF No. 20 at 3 ("Plaintiff has Stated a Sufficient Cause of Action under the Policy due to Its Failure to Exclude *Losses from a Chemical Reaction*") (emphasis added); ECF No. 1-1 ¶ 10 ("[L]osses due to chemical reaction are not excluded from policy coverage.").) At the same time, Ms. England argues that she has alleged that "the chemical reaction

---

[6] Ms. England also does not sufficiently allege "that the building or part of the building cannot be occupied for its intended purpose." (ECF No. 10-6 at 42.) Ms. England has not alleged any facts suggesting that the Property cannot be occupied as a "residence," which is the only description of its intended purpose in the complaint. (ECF No. 1-1 ¶¶ 3, 6).

[7] This is not entirely clear from Ms. England's brief. To the extent that she is arguing that she is entitled to coverage for "collapse" caused by a chemical reaction, however, that argument fails because, as already discussed, Ms. England has not alleged facts that plausibly suggest a "collapse" that would be covered by the Policies.

10

*is the 'direct physical loss'*" necessary to trigger coverage. (ECF No. 20 at 3 (emphasis added); (ECF No. 1-1 ¶ 9 ("Plaintiff[] [is] covered for 'direct physical loss to the property'; in this case, the chemical reaction that occurred in the concrete.").) I note at the outset that this is internally inconsistent: Ms. England cannot plausibly allege that the "loss" was the chemical reaction itself while at the same time alleging that the "loss" consists of "*damages caused by a chemical reaction.*" (ECF No. 20 at 4 (emphasis added).) Because a party may plead alternative and inconsistent theories, Fed. R. Civ. P. 8(d)(2), (3), however, I consider whether Ms. England states a claim under either theory.

Ms. England's first alternate theory is that the chemical reaction itself is covered as a "direct physical loss," independent of any of its manifestations. This is not a plausible reading of the Policies, because the terms "direct physical loss" and "loss," as used in the Policies, unambiguously require some change to the detriment of the insured, and a chemical reaction— without any physical manifestations—does not fit that bill.

The Policies themselves do not define the terms "direct physical loss" or "loss." However, the use of these terms in the Policies provides insight as to how I should construe them. *See Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*, 311 Conn. 29, 38 (2014) (acknowledging the well-settled principle that courts must look at a contract as a whole and consider all relevant portions together when interpreting an insurance policy); *see also Johnson & Johnson v. Guidant Corp.*, No. 06-cv-7685 (RJS), 2014 WL 3728598, at *15 (S.D.N.Y. July 22, 2014) ("The general rule of contract construction presumes that words have the same meaning throughout the contract." (internal citations omitted)) In the Policies' exclusions, for example, the term "loss" is used to describe the result of various excluded processes or events:

Section I – Perils Insured Against

    A. Coverage A – Dwelling and Coverage B – Other Structures
    . . .
    2. We do not insure, however, for *loss*:
    . . .
    c. *Caused by*:
    . . .
    (a) Wear and tear, marring, deterioration;
    (b) . . . [L]atent defect, inherent vice or any quality in property that causes it to damage or destroy itself . . .
    (f) Settling, shrinking, bulging or expansion, including resultant cracking . . . of . . . foundations, walls . . . .

(ECF No. 10-6 at 23-24 (emphasis added).) In other words, the "loss" is the damage or the detrimental change to the insured that is the product of these excluded processes and events. So understood, a "loss" can be the result of an originating chemical reaction but it cannot be the originating chemical reaction itself absent any physical manifestation.

The Policies use "loss" similarly in other provisions. For example, the provision titled "Suit Against Us" states, "No action can be brought against us unless . . . the action is started within two years after *the date of loss*." (ECF No. 10-6 at 29 (emphasis added).) This provision suggests that the term "loss" must be accorded a meaning that is limited to observable, tangible effects: if the term "loss" were interpreted to include the occurrence of an imperceptible chemical process, before that process were to result in any observable effect, no policyholder could determine a date of loss for the purpose of establishing the timeliness of the policyholder's suit.

The usage of "loss" in the Policies is consistent with its ordinary meaning. Black's Law Dictionary defines "loss" in the context of insurance as "[t]he amount of financial detriment caused by . . . an insured property's damage, for which the insurer becomes liable." *Black's Law Dictionary* (9th ed. 2014). "Loss" is more generally defined as "[a]n undesirable outcome of a risk; the disappearance or diminution of value, usu[ally] in an unexpected or relatively unpredictable way." *Id*. "Direct loss" is defined as "[a] loss that results immediately and

proximately from an event." *Id*. All of these definitions suggest that the term "loss" includes perceptible harms that manifest as a consequence of triggering events—but does not include the triggering events themselves. That the Policies specify that Amica provides coverage only for "direct physical losses" further underscores that a covered loss is treated separately from its cause for the purposes of coverage, and must be in the form of a perceptible harm for a policyholder to claim coverage.

Connecticut case law reflects a similar understanding of the difference between a loss and its cause. Specifically, courts interpreting insurance policies to determine the scope of insurance coverage have distinguished between loss or damage, on the one hand, and processes that could—but have yet to—cause loss or damage, on the other, ruling that the latter do not fall within the scope of coverage where the policies require physical loss or damage to trigger coverage. In *Capstone Building Corp. v. American Motorists Insurance Company*, the Connecticut Supreme Court held that "the escape of carbon monoxide, without more, is not property damage," and therefore did not constitute "physical injury to tangible property, including all resulting loss of use of that property" as required to trigger coverage under a commercial general liability policy. *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 782 (2013) (alteration omitted). The *Capstone* Court found persuasive reasoning in a recent New Hampshire Supreme Court case, in which that court ruled that the "seepage of odorless carbon monoxide from defectively installed chimneys was not 'property damage,' reasoning that the gas 'caused no physical, tangible alteration to any property' or any physical injury to the homeowners." *Id*. at 782-83 (quoting *Concord Gen. Mut. Ins. Co. v. Green & Co. Bldg. & Dev. Corp.*, 160 N.H. 690, 694 (2010)).

In line with the Connecticut Supreme Court's reasoning, other courts have interpreted the term "direct physical loss or damage" to "strongly impl[y] that there was an initial satisfactory

13

state that was changed into an unsatisfactory state." *City of Burlington v. Indemnity Ins. Co. of N. Am.*, 332 F.3d 38, 44 (2d Cir. 2003) (collecting cases interpreting Louisiana, Virginia, Washington, and Texas law for the purpose of interpreting Vermont law) (internal quotations and alterations omitted). Using this interpretation, the Second Circuit reasoned that "while the failure of a defective part qualifies as direct physical loss or damage, the defect itself, assuming the item has not yet failed, does not." *Id*.

All of this confirms that, to the extent she is seeking coverage for a chemical reaction alone as a "direct physical loss," Ms. England's claim fails. While the resultant cracking within Ms. England's walls likely qualifies as "direct physical loss to the Property," and "loss" as used in the Policies embraces the financial consequences thereof (although losses from cracking are excluded from coverage by other provisions), the chemical reaction itself, absent any physical manifestation in the Property marking a change to an unsatisfactory state, is not a "direct physical loss" or other "loss" under the Policy.

Using the ordinary meaning of the term "loss"—an undesirable outcome or financial detriment—I find that the only loss Ms. England sufficiently alleges to have occurred is the deterioration and cracking of the basement walls and the related financial harm. (ECF No. 1-1 ¶¶ 6-7, 11, 14, 16.)[8] And that loss is specifically excluded by the Policies.

Ms. England's second alternate theory is that she is entitled to coverage because she has suffered a "direct physical loss" as a result of a chemical reaction, and coverage for losses due to chemical reactions are not excluded under the Policies, as the term "chemical reaction" is not

---

[8] Ms. England's complaint also refers to "damage to the structure of the dwelling itself," but provides no allegations regarding the nature or extent of this alleged damage. (ECF No. 1-1 ¶ 6.) This allegation does not provide sufficient facts to support a claim for relief independent of Ms. England's allegations regarding concrete deterioration, cracking, and the resultant expected costs of replacing her basement walls. *See Ashcroft v. Iqbal*, 559 U.S. 662, 678 (2009).

14

specifically listed among the exclusions in the Policies. (ECF No. 20 at 3.) A reading of the Policies as a whole, however, makes clear that this second alternate theory fares no better than the first.

As noted above, the only "direct physical loss" identified in the complaint—that is, the only "physical, tangible alteration to any property," *Capstone Bldg. Corp.*, 308 Conn. at 782-83 (internal quotation omitted)—is the cracking and deterioration of the basement walls, and the financial "loss" therefrom, which is expressly excluded. Indeed, such a loss is excluded twice— when it "involv[es] a collapse" and when it does not. (*See* ECF No. 10-6 at 23 (excluding loss "[i]nvolving collapse, including . . . (1) [a]n abrupt falling down or caving in; (2) [l]oss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or (3) [a]ny cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to (1) or (2) above[,]" except when such loss otherwise qualifies for collapse coverage); *id*. at 23-24 (excluding loss caused by "deterioration . . . [s]ettling, shrinking, bulging or expansion, including resultant cracking, of . . . foundations, walls").)[9] It does not matter whether the originating event behind the cracking and deterioration was a chemical reaction; the exclusions in the Policies make no exception for losses for which the cause is itself a product of a chemical reaction. Indeed, many of the loss-producing causes listed in the exclusions either are the product of chemical reactions or are broad enough to include chemical reactions. (*See id*. at 23-24 (excluding loss caused by "rust or other corrosion, or dry rot" or "latent defect,

---

[9] As discussed above, Ms. England's complaint consistently characterizes the damage allegedly sustained as "deterioration" of the concrete. (ECF No. 1-1 ¶¶ 7, 11, 14-16.) Ms. England's argument that what is occurring on the Property should be distinguished from "the normal deterioration" or "the normal wear and tear" that occurs in a home fails to sidestep the Policies' exclusion, which does not limit the exclusion for losses caused by deterioration. (*See* ECF No. 20 at 3.)

15

inherent vice or any quality in property that causes it to damage or destroy itself").) Ms. England's argument that the Policies cover loss from cracking and deterioration when the cracking and deterioration are caused by a chemical reaction is therefore implausible.[10]

**IV.    Conclusion**

For the reasons stated above, Amica's Motion to Dismiss is GRANTED.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:    Hartford, Connecticut
September 11, 2017

---

[10]Amica also argues that Ms. England's suit is untimely based on the "Suit Against Us" provision in the Policies. Because Ms. England's claim otherwise fails, I need not and do not consider this argument.